Good morning. May it please the Court, Janice Deaton on behalf of Appellant Osa Inthavong. And Your Honors, the issue really this morning is what I laid out on the first page of my reply brief. What does it mean when two police detectives tell a 19-year-old who has been asked to come down to the station, was brought down to the station by two homicide detectives, look, we think you're lying, and he says, well, what will I do, what will I get if I say, you'll gain your freedom? And then he said, can I get my car back too? And they said yes. Now, as I indicated in my opening brief, I listed the various comments that were made by the two detectives throughout the interrogation. And one thing that I didn't really highlight in my opening brief is that prior to this comment from Mr. Inthavong regarding his car, there were pages and pages of transcripts regarding this car. He was very concerned about it. And the relevance of that is that when we talk about conscience, I mean, it's just, it's ridiculous to say that you need your car to have a clear conscience. And Mr. Inthavong's concern about his car, about the physical reality of getting his car back, along with getting his freedom back, makes it very clear what the police detectives meant and what Mr. Inthavong reasonably interpreted and inferred from their comments. Furthermore, he had made repeated denials prior to this promise of his freedom. He had denied being present at the scene. He had denied knowing anything about this. He had denied understanding even why his car had been impounded. And the police detectives were getting very frustrated with this. And that is when the colloquy regarding the freedom came, and that's at CR 121 to 122, at which point Kristen Ziani informed Mr. Inthavong that he was being questioned in a murder investigation, and he wanted Mr. Inthavong to tell him the whole truth. And Mr. Inthavong said he would do that, and what will I get? Kristen Ziani said your freedom. Can I get the car too afterwards? Absolutely. And then only after this statement did Mr. Inthavong proceed to place himself at the scene of the homicide. Additionally, what... I'm not sure how the car fits in here. What's the point you're trying to make with regard to the promise about the car? The car fits in, Your Honor, because for a police detective to say, oh, I didn't mean your freedom, as in Webster's dictionary definition of freedom, which is the first page of my reply brief, I meant that you'd have a clear conscience. Well, what do you need your car for to have a clear conscience? Well, didn't he get his car? I mean, my understanding is he was supposed to get his car when he left, so that's sort of a separate subject for me. I don't think he's talking about car as freedom. I think that that's taking it out of context, and I think that that's why the police detectives are disingenuous when they, quote, clarified what they meant by freedom. It's in the exact same... It's this next sentence. Kristen Ziani said, you get, quote, your freedom. Can I get the car too? And he said, absolutely. Now, if Kristen Ziani truly meant at that point in the interrogation prior to Mr. Inthavong placing himself at the scene of the homicide, and frankly, prior to making any incriminating statements, then he wouldn't have mentioned, he wouldn't have thrown the car in in this colloquy. But more importantly, Kristen Ziani... He threw the car in. Yes, but he wouldn't have needed the car. The reason that it's relevant is because it just is more corroboration of what Mr. Inthavong understood the word freedom to mean. Okay? It meant he went home, which is what he did. Yeah, but they arrested him. Two months later. Did he think it was a get out of jail free car? Absolutely. That's what the police detectives repeatedly told him and promised him. The truth will set you free. You'll gain your freedom. And in fact, they said, we're not going to, quote, BS you. I don't need to quote him literally here. I'm not going to play games with you. I'm not going to lie to you. You're going to get your freedom. Now, you know, unless we are going to change the meaning of freedom, according to Webster's Dictionary, freedom means the quality or state of being free. The absence of... I wouldn't say the quality or state of being free forever. I mean, he went home. He was home for two months before he got arrested. Isn't that freedom? That's correct. But no, I would disagree respectfully with your Honor. I think that when a person is being questioned about a homicide, he doesn't care about my freedom for the next month. They did say, you're going home today no matter what. Is it realistic for anybody to believe that he's going to be home free forever? He's going to get a complete pass. That seems to me pretty unlikely. But I don't think that that's the appropriate question here. The question is the police's conduct. And did they improperly induce a confession based on their lies? And to say only after... It's a lie only if their statements meant, you're never going to get charged for this. Once you tell us that you killed this guy, you're off the hook forever. And that seems to me to be an implausible interpretation. Well, I actually, I disagree respectfully. Again, I think that when somebody says, you'll gain your freedom, that's exactly what they meant. That's exactly what happened. That day he went home and he was home for like two months until he got arrested. That's correct. And I know that reasonable minds can differ. And as Mr. Lanahan said, I know the court gets to decide that. But I think that to allow the police to engage in this kind of conduct saying, I'm not going to lie to you. I'm not going to BS you. I'm going to tell you the truth. I'm not going to play games with you. And I think that that's critical. And then to say, oh, but repeatedly, the truth will set you free. And in fact, both detectives were saying, the truth will set you free, my friend. And Osa, I haven't lied to you once. I've been straight with you. I've been as straight as I'm going to get. And they consistently said, I can't make it any clearer than that. You'll gain your freedom. Now, I think that to say, you'll gain your freedom today, they're talking about a homicide investigation. They also interspersed these promises. And I think that this is also critical in the totality of the circumstances test. They interspersed their promises of his freedom, not of his going home that day, but his freedom with accusations that he's lying, with accusations that he was. Yeah, until they've made a promise that until they made their promise to him that he would gain his freedom. And they also made accusations of a very long prison term. And so the opposite of a long prison term is freedom. So I think that they were all on the same page. Judge Clifton, as far as we're not talking about today, we're talking about either you tell us the truth. And if you tell us the truth, you're going to gain your freedom. And if you don't, you're going to go to prison for a very long time with the council. Assuming you persuade us on that issue, that there might have been error. What about harmlessness? You didn't raise the harmless error issue in your COA, as I understand. I'm sorry. You did not raise the harmless error issue in my opinion. I did. Is it in the COA? The certificate of appealability? I he was pro per at that point, and I was Did you move to expand the certificate? No, I did not. I did. But Judge Miller, what Judge Miller did was he said he ruled in his initial order that that should be briefed because it wasn't it hadn't been briefed before. It hadn't been briefed before the magistrate. What Judge Miller said was that he did find that the confession was involuntary and that because the confession was involuntary, he wanted the issue of prejudice and the issue of the November 5th confession. Assuming two levels, that you win on the error and two that you preserved it in the COA, on the merits of harmlessness, wasn't there an enormous amount of other evidence that would be more than sufficient to convict? Well, that's certainly what the Deputy Attorney General argued. But in fact, there was the testimony of Pond who had gotten a deal. And in fact, as it turns out, it was his gun. There was evidence at trial that he had lied repeatedly to the police. There was no physical evidence of Mr. Nthibong at the scene other than his statement and Pond's. And then there was the testimony that was impeached by the female that was with him, and I've forgotten her name. And at trial, though, he testified in his testimony, he placed himself at the scene of the offense. But he did not – that alone would not, I don't believe, support a conviction for aiding and abetting murder. Okay. You've got about a minute left. Do you want to resume? Yes, thank you. You may. We'll hear from the government. Good morning, Your Honor. May it please the Court. Elizabeth Hartwig, co-respondent. The argument has been interesting up to this point, but it's the wrong argument for this Court in this case because this is an ADEPA case that's before the Court, and the Court is not reviewing whether or not the district court got it right in finding that a statement was voluntary or involuntary at the time of a suppression hearing. The question is whether the State court objectively – There's a discrepancy between the sequence that the Court of Appeal, the District Court of Appeal found and the sequence that the district court found. Is there not? There's – the district court found that – In a typical ADEPA situation, we can't simply defer to the Court of Appeal because there are discrepancies on the face of the opinion that came down from the CA. Well, and perhaps they're backed up by what could arguably be called a discrepancy in the transcript of the interrogation, which went on for, what, approximately 180 pages and for several hours. There's one – the district court was concerned that the statement about you'll gain your freedom preceded the explanation that freedom meant his conscience would be clear as opposed to walking away. But there had been a considerable amount of bickering going on between the officers and Mr. Infovong before that. Mr. Infovong had been pushing them to keep asking whether or not – or to determine what evidence it was they had that might implicate him, whether he could – how he was going to perhaps deal with that. And as – apparently, as he became convinced, as each piece put him closer and closer to being right smack at the place where this event occurred, he would concede what he couldn't get away from and then try to fudge on the next part of the evidence. He had conceded before the you'll get your freedom statement that he'd been driving the white Honda up on Belle Bluff. He conceded that he'd taken Mary Ann home, which is why he was driving on Belle Bluff, that he had driven back and someone had kicked his car. He conceded that he was the one that was driving that white Honda, and the police already had the license number, and knew that that car was involved, and he said he was the last person to drive it that night. He even stopped and got out of the car and looked back to see who it was that kicked his car. Correct. He conceded that as well. So he initially said, well, I wasn't there at all. I don't know anything about what you're talking about. And eventually it was, well, I was there, but I didn't have anything to do with the shooting or the killing, and I didn't intend to do anything to anybody. But before he – those two extremes, he had conceded to the police officers that he – that he'd been there – the car had been kicked, that he'd gone back to Clumsy's. He – either they had asked him or he had told them that the car had been kicked. And either he went back with them to find out what had happened to his car, or he went home and it was only his gang members who went up to Belle Bluff and vindicated his honor that had been attacked by the offender being kicked. But he was just – inch by inch, he was moving closer to finally conceding that he was there. And incidentally, the day after the murder, and before he – apparently before he had talked to the officers in this taped interview on the 16th of September, he told Tiffany M., who was one of the gang – she wasn't a member, but she was a hanger on with the gang group – she was present at Clumsy's house. She went up to the site on Belle Bluff where the shooting occurred. And he told her that he was present – I'm sorry, he told Marianne, not Tiffany – that he was present, but he didn't do the shooting. And the evidence absolutely confirmed that. It seems to me like you're arguing, lest the AEDPA defer to the state court standard and more like an independent determination of voluntariness, which we can make as a matter of law here, can we not? No. Well, I – this court obviously does an over-review of the district court rejection, and therefore the basis of what the district court – or what the district court relied on. But I would submit what the district court ultimately concluded after it went back on the motion to reconsider was that even though it disagreed with one particular factual part of the appellate court or the state court's finding as to voluntariness, because it disagreed in implying – Well, but that wasn't a matter of interpretation. That was simply an observation that the DCA opinion was erroneous. It improperly stated the facts. The facts were – One particular fact. Were simply stated wrong in a admittedly narrow area, but at least it was a misstatement by the DCA. On that one issue, I would submit that the district court was honing in on the sequence of two facts, whether A preceded B or B preceded A. And when you back up in a totality analysis, given that – You're saying it really doesn't matter. Yes. All right. I understand. Yes. And if the district court ultimately concluded, even if I in the district court disagree under ADEPA, that's not sufficient to overturn this conviction because of the deference we owe to the state court because it wasn't an objectively unreasonable finding of fact. It wasn't – well, even if that was, it wasn't an objectively unreasonable application of controlling Supreme Court precedent, and it wasn't an objectively unreasonable application of harmless error. So we never get to Brecht in determining whether there was harmless error in the way the district court resolved or in the way the state court resolved the matter. But even if we did, on the record of this case, it would be harmless. Well, now, how about your response to the argument on the specific merits here about the quid pro quo between getting your freedom and testifying? I disagree. I'm afraid my argument was stolen because I jotted down the comment that it was ridiculous to assume a confession to murder means a get-out-of-jail-free card. However, and I think given the way this man, Infolong, was bickering with the officers and pushing them and fencing with them and trying to find out what they knew and how much wiggle room he had in terms of whether he could explain away certain things. And he would – these incremental concessions as he figured out that he simply didn't have any place to go. And he ended up – his real quarrel or his real defense, and it was a defense that he was being picked on because he was a gang member and there was a bias and there was an assumption that this was a violent confrontation because there were gang members involved. Excuse me. But he's adamant that he didn't shoot Dobson, and the evidence is clear that he didn't shoot Dobson and he was prosecuted as an aider and abetter and not as the shooter. So everybody ended up at the same place in the evidence. And the State's evidence separate from his statement was overwhelming, that he was the man who was killed, and he had nothing to do with the car-kicking incident. And therefore, any – if there was an error in finding that – whether it's characterized as coercion or the ultimate finding that the statement was voluntary, the impact was harmless because of the State's evidence. Thank you, counsel. Ms. Deaton, you have some reserve time. Your Honors, I would just like to briefly point out two things. First of all, the district court below reversed itself based on 2254d-1. It – the district court, Judge Miller, said that he needed to defer based on – that the State court had not unreasonably applied Supreme Court precedent. And I believe that – That was the initial. When it – when it issued its amended order reversing its earlier order. In other words, granting the Attorney General's motion for reconsideration. But if we look at 2254d-2 and Taylor v. Maddox, if a State court plainly misapprehends or misconstrues or misrepresents the facts based on the facts as presented, then that is a misapprehension of the State court. And that is – Ms. Hardwig suggests that's essentially de minimis. Yes, and I would just disagree. I think that – I mean, that's what Taylor v. Maddox is based on, is an erroneous or an unreasonable finding of fact. And again, the focus – so that – or else that would render 2254d-2 irrelevant. And then the only other question or issue that I would like to comment on very briefly is that – Your time has expired. Okay. That's fine. Thank you. Thank you very much, Counsel. Thank you. The case just argued will be submitted for decision.
judges: Reinhardt, O'scannlain, Clifton